UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APOLLOS PIERRE,

                         Plaintiff,

        - against -

SUMMIT SECURITY SERVICES,

                         Defendant.

1:07-cv-02688-RJH-HBP

**MEMORANDUM OPINION
AND ORDER**

        Pro se plaintiff Apollos Pierre filed this employment discrimination action against
his former employer, Summit Security Services, after he was fired in May 2006.  Summit
has moved for judgment on the pleadings or summary judgment.  For the reasons that
follow, Summit's motion for summary judgment will be granted.

## BACKGROUND

        The Court reviews the record in the light most favorable to Mr. Pierre.  *See
Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

        Mr. Pierre immigrated to the United States from Haiti in 1987 (Pierre Dep. 35,
Herndon Decl. Ex. K, Feb. 19, 2009.)  In 2002, he became a practicing Seventh Day
Adventist.  (*Id.* at 28.)  As such, Mr. Pierre strongly prefers not to work on the Sabbath,
which runs from sundown on Friday to sundown on Saturday.  (*Id.*)  Mr. Pierre observes
the Sabbath by praying, preaching, and visiting the sick and elderly.  (*Id.* at 28-29.)

        From December 2001 to May 2006, Mr. Pierre was employed by Summit as a
security guard.  (*Id.* at 37, 44.)  Aside from a few days at the beginning of his
employment, Mr. Pierre worked exclusively at 390 Fort Washington Avenue, a dormitory

in Washington Heights that is owned by Columbia University.  (*Id.* at 38, 43.)  Mr.

Pierre's job was to monitor the building's entrance and lobby.  (*Id.* at 38.)

Not long after he was hired, Mr. Pierre told a scheduler at Summit that he could

not work on the Sabbath.  (*Id.* at 48.)  The scheduler promised to do what he could to give

Mr. Pierre Fridays and Saturdays off.  (*Id.*)  Although Mr. Pierre and Summit had a

difficult relationship, the company appears to have kept this promise.  With the exception

of one schedule proposed immediately before Mr. Pierre was fired, Summit never

required Mr. Pierre to work on Friday or Saturday.  (*Id.* at 102-03 ("I have never worked

Fridays and Saturdays.  The problem I have is that they always wanted to change my

schedule and that schedule, that would include Friday and Saturdays, and I always said

no.").)

As already noted, Summit terminated Mr. Pierre's employment in May 2006.  Mr.

Pierre contends that the company's actions on four principal occasions demonstrate that

Summit unlawfully discriminated against him on the basis of his religion and his race.

(Compl. ¶¶ 5, 7; Pierre Dep. 153.)

1.  In June or July 2002, a security guard identified at Mr. Pierre's deposition as

"Ms. Strough" reported to Summit's management that Mr. Pierre had signed for packages

for a tenant, used profanity, left a communal bathroom dirty, and given a tenant the

original keys to her apartment in violation of Summit policy.  (Pierre Dep. 74-76, 83.)

Mr. Pierre maintains that the allegations were baseless.  Nonetheless, he was suspended

without pay.  (*Id.* at 85-86.)  Summit maintains it has no records of this suspension.

(Rossello Aff. ¶ 12, Feb. 19, 2009.)

After Mr. Pierre returned to work on August 25, 2002, Summit deducted union dues from his paycheck.  (Pierre Dep. 92.)  Mr. Pierre found this "bizarre" and told his union about it.  (*Id.* at 93.)  Summit maintains, and Mr. Pierre does not contest, that it has no control over the union dues taken out of Mr. Pierre's paycheck.  (Rossello Aff. ¶ 22.)

Mr. Pierre testified that around the time he was first suspended, Jim Nicchio, Summit's Regional Manager, asked him if he had been a member of the Haitian army. (Pierre Dep. 87.)  Mr. Pierre found the question offensive.  Because of the army's role in the Duvalier dictatorship, being accused of belonging to the army is a grave insult in Haitian society.  (*See id.* at 89.)  Mr. Nicchio categorically denies asking Mr. Pierre whether he belonged to the army.  (Nicchio Aff. ¶¶ 4-5, Feb. 19, 2009.)

2.  In September 2005, another security guard, Madeline Barbarosa, complained to Summit's management that Mr. Pierre was arriving late for work.  (Pierre Dep. 95-96.) Mr. Pierre denied the allegation.  He claimed that according to his paychecks, which were generated from Summit's records, he was always on time.  (*Id.* at 96.)  Nevertheless, Mr. Pierre was once again suspended without pay.  (*Id.* at 99.)

Mr. Pierre testified that during this incident, no one ever said anything to him about his race or religion.  (*Id.* at 101-02.)  Ms. Barbarosa, however, told Mr. Pierre that "they"—presumably a reference to Summit's management—hated him.  (*Id.* at 101.) And Summit "on many occasions" called Mr. Pierre to see if he could work Saturdays. (*Id.* at 102.)  Mr. Pierre always told Summit that he could not work on Friday or Saturday.  (*Id.* at 102-03.)  However, he feels that Summit was wrong to ask and believes that asking him to work on Friday and Saturday was a form of discrimination prohibited by law.  (*Id.*; *see* Pierre Aff. 18, May 5, 2009.)

When Mr. Pierre returned from the suspension, Summit once again deducted union dues from his paycheck.  (Pierre Dep. 99-100.)  In addition, his uniform, shoes, and identification were missing.  (*Id.* at 120.)  Summit never reimbursed Mr. Pierre for these items.  In Mr. Pierre's view, this shows that the company was trying to keep him from working; because state identification is necessary to secure employment, "what that meant is that they sent me to a shelter."  (*Id.* at 153.)  Summit notes that under its "Security Officer Manual," which was incorporated by reference into Mr. Pierre's employment contract, it assumed no liability for Mr. Pierre's personal property.  (Herndon Decl. Ex. N, at 36; *see also* Herndon Decl. Ex. M ¶ 13.)  Indeed, the manual expressly cautions security guards not to leave personal property at work.  (Herndon Decl. Ex. N, at 36-37.)

3.  Sometime in March 2006, another security guard, who appears to have been Mr. Pierre's supervisor, told a tenant at 390 Fort Washington Avenue that Mr. Pierre had called her a whore.  (Pierre Dep. 126.)  An unidentified Columbia employee confronted Mr. Pierre and asked him if there was someone in the building that he did not like.  (*Id.* at 127.)  Mr. Pierre denied having problems with anyone.  (*Id.*)  The Columbia employee told Mr. Pierre to keep quiet.  (*Id.* at 127-28.)

On April 2, 2006, Mr. Pierre found out that he had been suspended when he showed up for work.  (*Id.* at 130.)  He complained to his union, and on April 13, 2006, a meeting was held with a number of Summit managers and Mr. Pierre's union representative.  (*See id.* at 133-35.)  The parties agreed to five conditions regarding Mr. Pierre's future employment.  Mr. Pierre described them as follows:

> The first one was for me not to go to Columbia.  Second point was they would give me a schedule that did not include the Sabbath.  The third for it

> was they would give me the schedule that I had primarily.  The fourth was
> they would give me the same pay rate that I had before.  The fifth point
> was that I would be transferred and remember . . . that they told me not to
> go to Columbia anymore.

(*Id.* at 136.)  A contemporaneous "warning report" filled out by Angelica Rossello,

Summit's Director of Human Resources, noted that Mr. Pierre was "[a]dvised and

warned, if he contacts the clients @ Columbia he will be terminated from employment."

(Herndon Decl. Ex. O.)  According to the warning report, Mr. Pierre and his union

representative agreed to this condition.  (*Id.*)

On the day of the meeting, Mr. Pierre was assigned a schedule at a new location

that required him to work Saturdays.  (Pierre Dep. 142.)  He complained to Ms. Rossello,

who told him that Summit would call him, presumably to propose a new schedule.  (*See*

*id.*)  Mr. Pierre also complained to his union representative, who told him to start

collecting unemployment because Summit was "playing games."  (*Id.* at 140, 142.)  Mr.

Pierre never contacted Summit about his schedule after April 13, 2006, and it appears that

the scheduling issue was never resolved.  (*See id.* at 140.)

4.  On May 9, 2006, Mr. Pierre was fired.  Summit maintains that it fired Mr.

Pierre because he called Columbia University's security director after agreeing not to do

so.  (Rossello Aff. ¶ 19.)  In a sworn affidavit, Ms. Rossello explains:

> On May 9, 2006, I asked Mr. Pierre to meet with me in my office
> regarding his actions of calling the security director at Columbia
> University after he agreed not to do so.  According to Mr. Pierre, he
> claimed that Columbia University's director was his supervisor and he
> would continue to call her as he pleased.  I told Mr. Pierre that he violated
> both Summit's Employment Agreement and our agreement on April 13,
> 2006 and as such he would be terminated.

(*Id.* (citations omitted).)  This account is consistent with a contemporaneous internal

memorandum prepared by Todd Mills, Summit's Client Service Manager.  (*See* Herdron

Decl. Ex. P, at 2.)  There, Mr. Mills reports that two security guards at Columbia complained to him that Mr. Pierre had been calling approximately twice a week in an effort to speak to Columbia's security director.  (*Id.*)[1]  Mr. Pierre concedes that he called Columbia sometime between May 1, 2009, and May 13, 2006, and again in June or July 2006.  (Pierre Dep. 143-44.)

On July 25, 2006, Mr. Pierre filed a verified complaint with the New York State Division of Human Rights.  (Herndon Decl. Ex. A.)  After an investigation, the Division determined that there was no reason to believe that Summit had discriminated against Mr. Pierre on the basis of his creed, race, or color.  (Herndon Decl. Ex. D, at 3.)

On March 1, 2007, Mr. Pierre filed his complaint in this Court.  The complaint asserts claims for discriminatory discharge and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2006), as well as a claim for "[f]ailure to pay me."  (Compl. ¶ 4.)  On February 20, 2009, Summit moved for judgment on the pleadings or summary judgment.  Summit contends that the record contains no evidence from which a jury could rationally find for Mr. Pierre on any of his claims.  In the alternative, it contends that Mr. Pierre's action is time-barred.

Mr. Pierre submitted two affirmations in opposition, dated March 19, 2009, and May 5, 2009.  In his principal affirmation, Mr. Pierre avers that he was wrongly suspended for refusing to accept changes in his work schedule that would require him to violate his religious beliefs.  (Pierre Aff. 8, March 19, 2009.)  After relating the details of the incidents described above, Mr. Pierre avers that Summit personnel persecuted him

---

[1] The Court considers Mr. Mills' memorandum for the limited, non-hearsay purpose of ascertaining its effect on Ms. Rossello.  *See* Fed. R. Ev. 801(c) (defining hearsay as a statement "offered in evidence to prove the truth of the matter asserted"); *cf. Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001).

and engaged in a long-running conspiracy to have him fired.  (*See id.* at 4-5.)  With respect to his termination, Mr. Pierre argues, "The agreement was I had to move from Columbia but same pay rate schedule because I observe sabbath and do no[t] go to Columbia because my coworke[r] Brown is still working there.  Ms Angelica violated the agreement by offering me [a] Sabbat[h] schedule."  (*Id.* at 7.)  He explains that as he understands Summit's position, "Ms Angelica fired me because I called to get my stuff that I left at Columbia."  (*Id.*)

In his second affirmation—a sprawling, forty-page "surreply"—Mr. Pierre avers among other things that all the accusations Summit leveled at him are false (*see, e.g.*, Pierre Aff. 5, 24, May 5, 2009); that he was unaware of the terms of his employment contract (*see, e.g.*, *id.* at 11-12, 36); that Summit harassed him on the basis of his religious beliefs by asking him to work on the Sabbath (*see, e.g.*, *id.* at 18); and that no amount of money can compensate him for the injury he has suffered (*id.* at 39).  With respect to his termination, Mr. Pierre denies that he agreed not to contact Columbia, and avers that he did so only in order to retrieve his belongings.  (*Id.* at 27-29.)[2]

## DISCUSSION

In view of the "special solicitude" given to pro se litigants' submissions, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006), the Court concludes that Mr. Pierre's complaint plausibly alleges a violation of Title VII.  *See*

---

[2] Mr. Pierre also appears to request the Court's authorization to conduct additional discovery.  (*See* Pierre Aff. 6, 24, May 5, 2009.)  The request is untimely (*see* Docket No. 8), Mr. Pierre did not fully cooperate in the discovery process (*see* Docket Nos. 9, 10, 11), and Mr. Pierre has offered no explanation for why further discovery is necessary to "present facts essential to justify [his] opposition" to Summit's motion.  Fed. R. Civ. P. 56(f).  His request is therefore denied.

*Erickson v. Pardus*, 551 U.S. 89 (2007).  Accordingly, the Court denies Summit's motion for judgment on the pleadings and turns to Summit's motion for summary judgment.

Under Title VII, it is unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  It is likewise unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter"—that is, by title 42, chapter 21, subchapter VI of the United States Code.  § 2000e-3(a).

In the absence of direct evidence of discrimination or retaliation, courts frequently analyze claims under both of these provisions using the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See generally Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  The plaintiff employee bears the initial burden of establishing a prima facie case of discrimination or retaliation.  The burden of production then shifts to the defendant employer to adduce a legitimate, nondiscriminatory reason for its actions.  Finally, the burden of production shifts back to the plaintiff to establish that the employer's articulated reason was a pretext to mask unlawful discrimination or retaliation.  *See, e.g.*, *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (discriminatory discharge); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (retaliation).  Throughout the process, the plaintiff carries the ultimate burden of persuasion.  *Reeves*, 530 U.S. at 143; *Burdine*, 450 U.S. at 253.

In response to a properly supported motion for summary judgment, a plaintiff "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A plaintiff therefore "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And, a plaintiff does not create a genuine issue for trial "merely by the presentation of assertions that are conclusory." *Patterson*, 375 F.3d at 219. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

Turning first to Mr. Pierre' claim for discriminatory discharge, the Court concludes that Summit is entitled to summary judgment. At the outset, the Court has serious reservations about whether Mr. Pierre has made out a prima facie case of discriminatory discharge. *See Patterson*, 375 F.3d at 221 ("In order to make out a prima facie case of racial discrimination in the termination of employment in violation of Title VII, a plaintiff is required to adduce some evidence that would permit a factfinder to infer, *inter alia*, that the termination occurred under circumstances giving rise to an inference of discrimination."). To be sure, Mr. Pierre's burden at this stage is "not onerous." *Burdine*, 450 U.S. at 253. But after a careful review of the record, the only evidence of discrimination the Court can identify is Mr. Nicchio's alleged question about Mr. Pierre's membership in the Haitian army, and Summit's repeated requests that Mr. Pierre work on Friday and Saturday. This evidence, however, shows very little. The army comment came four years before Mr. Pierre was fired, so it is difficult to see a causal connection between it and Mr. Pierre's termination. And while Summit may have

asked Mr. Pierre to work Fridays and Saturdays, the record also shows that the company never required him to do so.  Indeed, if the record supports any inference, it is that Summit repeatedly accommodated Mr. Pierre's expressed need to keep the Sabbath holy. (*See* Pierre Dep. 102-03.)  Such actions hardly support an inference that Mr. Pierre was terminated "because of" his religion, even if his relations with his coworkers were poisonous.

Any qualms about Mr. Pierre's prima facie case are beside the point, however, because the record contains no evidence from which a jury could rationally conclude that Summit's proffered reason for firing Mr. Pierre was pretextual.  Although Mr. Pierre believes that he never agreed not to call Columbia, Summit believed the opposite, and nothing calls into doubt Summit's contention that it fired Mr. Pierre because he violated his alleged agreement not to contact Columbia.  Stated differently, even if there was no agreement not to contact Columbia—and the record overwhelmingly suggests otherwise—Mr. Pierre has not pointed to any facts from which a jury could conclude that Summit did not fire him believing in good faith that he had violated that agreement.

For this reason, there is no genuine issue for trial when it comes to Mr. Pierre's claim for retaliation.  Assuming for the sake of argument that Mr. Pierre engaged in protected activity by complaining about Summit to his union, nothing in the record suggests that Summit fired him because of those complaints rather than for violating his agreement not to call Columbia.

That leaves Mr. Pierre's claim for "failure to pay me."  Construing this as a claim for breach of Mr. Pierre's employment agreement, the Court cannot identify any contractual provision that Summit violated.  Mr. Pierre appears to argue that Summit

should reimburse him for union dues that were deducted while he was suspended, and for his lost uniform, shoes, and identification. Summit, however, has offered uncontradicted evidence that it has no control over the union dues taken out of Mr. Pierre's paycheck. (Rossello Aff. ¶ 22.) And as noted above, Mr. Pierre's employment agreement expressly provides that the company is not liable for lost property. (Herndon Decl. Ex. M ¶ 13; Herndon Decl. Ex. N, at 36.)

## CONCLUSION

Summit's motion for summary judgment is **[13]** is granted. The Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
      August **14**, 2009

Richard J. Holwell
United States District Judge